## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

In re

**PETER J VAN NICE,** and
**MICHELLE A VAN NICE**,

                      Debtors.

Case No. **07-60080-13**

## *MEMORANDUM of DECISION*

At Butte in said District this 26th day of July, 2007.

In this Chapter 13 bankruptcy case, after due notice, the Court held a hearing on July 10,

2007, in Butte on: (1) confirmation of Debtors' Fourth Amended Chapter 13 Plan filed July 3,

2007; (2) Debtors' Objection to Amended Proof of Claim No. 14 filed by Kelsey Van Nice

("Kelsey"); (3) Debtors' Objection to Proof of Claim No. 30 filed by Erin Lee Lanigan ("Erin");

and (4) Debtors' Objection to Proof of Claim No. 15 filed by Lynn Van Nice ("Lynn").  R.

Clifton Caughron ("Caughron") of Helena, Montana, represented  Debtors at the hearing.  John

Grant of Helena, Montana, represented Kelsey, Erin and Lynn (collectively referred to as

"Lanigan/Van Nice") at the hearing.  The Chapter 13 Trustee, Robert G. Drummond of Great

Falls, Montana, also appeared at the hearing.  The Court heard testimony from Peter Van Nice

("Peter"), Michelle Van Nice ("Michelle"), Kelsey, Erin and Lynn.  Lanigan/Van Nice's Exhibits

1, 2 and 3 were admitted into evidence without objection.  Debtors' Exhibit A, and Exhibits C

through Y were also admitted into evidence without objection.  Debtors' Exhibit Z was admitted

1

into evidence, but Debtors' counsel was instructed to refile the exhibit without the handwritten notes.[1]  At the conclusion of the hearing, the Court deemed the record closed and took the matter under advisement.

CONTENTIONS OF THE PARTIES

Lynn, Peter's ex-spouse, asserts a priority claim against Debtors in the amount of $14,110.00 for past due maintenance and alimony.  Erin, Peter's eldest daughter, asserts a priority claim of $30,007.88 against Debtors, which amount, according to Erin, is owed to her for her college tuition, room and board.  Finally, Kelsey, Peter's youngest daughter, asserts a priority claim of $13,391.22 and an unsecured claim of $2,500 against Debtors for amounts she alleges are owed for monies Peter borrowed and for her college tuition, room and board.  Debtors, through Caughron, filed objections to the aforementioned proofs of claim.  However, Caughron completely ignored Mont. LBR 3007-2 when he filed Debtors' skeletal objections.[2]  In particular, Debtors' one sentence objections contain no factual or legal basis for the objections, but rather, merely inform Lynn, Erin and Kelsey that the matters are being set for hearing.

Not knowing the reasoning for Debtors' objections, the Court and opposing counsel were precluded from fully preparing for the hearing.  However, at the hearing, it came to light that Debtors were objecting to the amount claimed by Lynn and were asserting that little, if anything, was owed to either Erin or Kelsey.  This Memorandum of Decision sets forth the Court's findings of fact and conclusions of law.  For the reasons discussed herein, the Court finds that

---

[1]  Not surprisingly, Debtors' counsel has not refiled Exhibit Z as instructed.

[2]  Mont. LBR 3007-2 provides that an "objection shall include the legal and factual basis for the objection."

Lynn's Proof of Claim is overstated by the sum of $2,090.00. The Proof of Claim filed by Erin is

is also overstated and shall be allowed as a priority claim in the amount of $16,897.00. The

priority portion of Kelsey's Proof of Claim is overstated and shall be allowed as a priority claim

in the amount of $9,329.00, while the unsecured portion of Kelsey's Proof of Claim shall be

reduced from $2,500 to $1,500.

BACKGROUND

Peter and Lynn were married for over 20 years, but their marriage was dissolved pursuant

to a Decree of Dissolution in 2000. Erin and Kelsey are the daughters of Peter and Lynn. At the

time that Peter's and Lynn's marriage was dissolved, Peter was working for the Federal Reserve

Bank. However, Peter lost his job in 2002. Following the loss of his job in 2002, Peter was on

unemployment and living meagerly. Peter accepted a position at Express Personnel in May of

2003 and stayed in that position until February of 2004. Peter was out of work in March and

April of 2004, but took a position at Mergenthaler Transfer and Storage earning a salary of

$48,000 per year. After two months at Mergenthaler Transfer and Storage, Peter accepted a

position at a bank in Billings. Peter worked at the bank in Billings from July 2004 to May 2006,

when Peter returned to Helena. Peter is now employed by a construction firm.

It appears from the testimony that Peter and Lynn maintained an amicable relationship for

at least some period of time following the dissolution of their marriage. It also appears that Peter

maintained some semblance of a normal father/daughter relationship with Erin and Kelsey until

sometime between 2003 and 2005, when according to Kelsey, Peter dropped out of Erin's and

Kelsey's lives. Prior to the time when Peter disappeared from Erin and Kelsey's lives, Kelsey

described Peter as fun loving and carefree. Kelsey said it was fun to go to her dad's house

because they would eat Oreos and Cheetos and just hang out.  In fact, when Erin started college, Kelsey spent one-half her time living with Peter and the other one-half time living with Lynn.

Erin testified that when Kelsey began driving, Peter decided that he would buy Erin a car and let Kelsey drive the Tempo that Erin had previously been driving.  Accordingly, Peter bought a car for Erin in 2001.  At the time of purchase, Peter wrote a check in the amount of $3,895.00 for the car, and from the testimony, it appears that Peter also made monthly payments on the car for a period of time. However, after Peter lost his job and ran out of money, Peter asked Erin to make the last 5 or 6 payments on the car, which payments totaled $600.00 or so.

As noted above, Kelsey originally began driving a 1990 Ford Tempo.  But as Exhibit X reflects, the Tempo began needing various repairs.  In fact, Peter spent $637.67 in repairs on the Tempo in the Fall of 2002.[3]  Shortly after the aforementioned repairs were completed, Peter and Kelsey traded the Ford Tempo for a 1989 Jeep Cherokee.  Per Exhibit F, Peter was the purchaser of the Jeep while Kelsey was the co-purchaser.  At the time of purchase, a balance of $1,600 was owed on the Jeep Cherokee.  Peter paid $600.00 toward the remaining balance, but when he ran out of money, Peter advised Kelsey that he would not be able to pay the remaining $1,000. Although Peter was unable to pay the final $1,000 owing on the Jeep Cherokee, Peter did let Kelsey borrow his Bronco during a period of time when the Jeep would not run and needed repairs.

When Peter began experiencing severe financial difficulties, Kelsey loaned Peter $1,000.00 from monies she received from her grandmother's estate and again later loaned Peter

---

[3]  During this same period of time, Peter also spent $191.59 on repairs to a 1995 Dodge Neon, which is presumably the car that Peter purchased for Erin.

4

another $1,000 to pay Peter's taxes.  The unsecured portion of Kelsey's claim stems from the above two loans and also includes the balance owing on the Jeep Cherokee of $1,000 that Peter was not able to pay.

Lynn and Erin's claims, and the priority portion of Kelsey's claim, stem from Peter and Lynn's  Decree of Dissolution, which reads in part:

> 8.  <u>MAINTENANCE (ALIMONY)</u>: Lynn is unable to support herself through appropriate employment and has not received any income producing assets in this matter.  Peters agrees to pay Lynn $330 per month on the first of each month for the first 12 months after the signing of the Decree, and the sum of $750 per month on the first of each month for the next 48 months.  The maintenance terminates on the death of Lynn, her remarriage, or the passage of 5 years.

> * * *

> 11.  <u>CHILD SUPPORT</u>: (a) The parties have exchanged financial information.  For purposes of child support Lynn's income is $20,568 and Peter's income is $55,000.

> (b) Peter's obligation for child support to Lynn is $728 per month, by the 15[th] of each month.  Medical and child support shall be paid until the children turn 18 or, if a child is still in high school, until the child graduates from high school or turns 19, whichever occurs first, unless the child is sooner emancipated by Court Order.

> (c) the parties agree Peter shall be responsible for cost of post secondary education up to 4 years in an amount equal to the cost of In State tuition at a Montana University System unit for a full credit load of courses plus dormitory style room and board.  Such sum is intended to equal an upper limit of his exposure.  The parties, including the children, agree Peter is to make his best efforts to supply that sum as needed.  The parties, including the children, are required to use due diligence to apply for available scholarships and loans.  To the extent that monies are loaned the child, Peter may, by agreement, assume the loan as opposed to cash payment.

 Peter testified that he paid Lynn what he could afford to pay her as far as maintenance and alimony.  Peter contributed $2,000.00 toward Erin's first semester of college and also paid

$529.48 for Erin's books in December of 2001. Finally, Peter also paid $2,654.00 for Erin to take a trip to Italy her freshman year of college. Peter has not had the financial wherewithal to assist Kelsey in any way with her college, although Peter did cosign a $2,500.00 student loan for Kelsey. Peter feels that his contributions to Erin and Kelsey's schooling represent his best efforts and that he is not legally obligated to pay any additional amounts. The Court left the hearing with the distinct feeling that Erin and Kelsey feel that Peter has a moral obligation to make proper payment and that, as a result, they are entitled to reimbursement for all monies they spent at college.

## DISCUSSION

Debtors' pending objections do not involve any major factual dispute and the parties do not appear to disagree over the applicable law. Resolution of Debtors' objections boil down to two items: first, whether the Court is more persuaded by Debtors' Exhibit U or the attachments to Lynn's Proof of Claim, admitted into evidence as Exhibit 1, and second, an interpretation of paragraph 11 of Peter and Lynn's Decree of Dissolution.

The parties are undoubtedly aware of FED. R. BANKR.P. 3001(f), which provides that a proof of claim completed and filed in accordance with 11 U.S.C. § 501 and any applicable Bankruptcy Rules constitutes *prima facie* evidence of the validity and amount of the claim. Thus, if a procedurally proper claim is filed, an objecting party carries the burden of going forward with evidence contesting the validity or amount of the claim. *In re Weber*, 16 Mont. B.R. 49, 56 (Bankr. D. Mont. 1997); *Wright v. Holm (In re Holm)*, 931 F.2d 620, 623 (9th Cir. 1991). However, once the objecting party succeeds in overcoming the *prima facie* effect given to the claim by Rule 3001(f), the burden shifts to the claimants to prove the validity of their claims

6

by a preponderance of the evidence.  *In re Allegheny Int'l, Inc*. 954 F.2d 167, 173-74 (3rd Cir. 1992).

Debtors' skeletal written objections certainly did not overcome the *prima facie* validity of the claims afforded by Rule 3001(f).  However, the testimony and Exhibits offered at the hearing eventually established that Peter and Lynn agree that Peter has paid all child support owing under the Decree of Dissolution.  However, Peter and Lynn also agree that Peter has not paid Lynn all the maintenance due and owing under the Decree of Dissolution.  In preparation for the hearing, Peter went through his bank records and compiled Exhibit U, showing what Peter owed under the Decree of Dissolution for each month from May 2000 forward for child support and maintenance.  Peter's Exhibit U also shows what Peter paid each month toward his monthly child support and maintenance obligations.  Peter's Exhibit U reflects that Peter still owes monthly maintenance to Lynn in the amount of $12,020.00.

Peter testified that $12,020.00 should be the upper limit of what Peter owes Lynn because Peter paid $1,779.95 toward the purchase of appliances for Lynn in March of 2000, *see* Exhibit V, paid Lynn's 2000 federal income tax obligation in the amount of $2,224.00 in 2001, *see* Exhibits C and W, paid $300.00 for the preparation of Lynn's 2000 income tax returns, *see* Exhibit W, contributed $955.00 toward summer camps for Erin and/or Kelsey, and paid roughly $829.26 for repair work on Erin's and Kelsey's cars, of which, according to Peter, Lynn should pay half.[4]  If Peter is allowed credit for the above amounts, Peter contends he would only owe Lynn $6,346.42.

---

[4] Page 2 of Debtors' Exhibit Z reflects that Lynn paid $903.58 for repairs to Kelsey's Jeep Cherokee, which repairs included replacement of the engine.  Lynn also paid $228.24 to keep Peter's Bronco, that Kelsey was using, in working order.

Exhibit V reflects that Lynn purchased three appliances at Vann's Appliance on March 30, 2000.  The testimony was unclear as to whether Lynn paid for the appliances and was then reimbursed for the purchase price by Peter or whether Peter went ahead and paid the invoice directly.  At any rate, the appliances were bought prior to the entry of the Decree of Dissolution. The Decree of Dissolution does not appear to charge Lynn with responsibility for payment of such appliances and to do so at this juncture would result in an improper modification of the Decree of Dissolution.  As for the amounts that Peter paid for the preparation of Lynn's 2000 income tax returns, and the amounts that Peter paid toward Lynn's income tax obligations, the Court is not aware of any ancillary agreement between Peter and Lynn that allows Peter to pay such amounts in lieu of maintenance.  Finally, the Court will not allow Debtors an offset against Lynn's claim for amounts that Peter paid toward summer camps or car repairs.  As with Peter's payment of Lynn's income tax obligation and tax return preparation, no evidence exists in the record to show that the amounts that Peter paid for summer camps and car repairs were anything other than gratuitous gestures by Peter that were intended to provide Lynn a good start following her divorce from Peter and were intended to provide a seamless transition for Erin and Kelsey following Peter and Lynn's divorce.

Notwithstanding the foregoing, Debtors' Exhibit U is sufficient to overcome the evidentiary effect of Rule 3001(f), in that it shows that the claim asserted by Lynn in the amount of $14,110.00 is overstated by $2,090.00.  Because the burden in this instance has shifted to Lynn, it was incumbent upon Lynn to prove the validity of her claim by a preponderance of the evidence.  In support of her claim, Lynn prepared a document that reads in part: "Pete owes me May-Dec 2002: $1,150 (May-Dec no Oct) + $300 Jan + Feb = $1,450.00".  The document in

8

support of Lynn's proof of claim is confusing, and appears to disregard the extra maintenance payment or payments of $5,040.00 that were made by Peter to Lynn in 2001/2002 as reflected on Exhibit U.[5]  The attachment to Lynn's proof of claim lacks clarity while Exhibit U is straightforward.  The lack of clarity surrounding Lynn's handwritten calculations and Lynn's failure to adequately explain her calculations at the hearing, convince this Court that Exhibit U is a more convincing summary of what Peter owes Lynn.  Consequently, Lynn has failed to prove the validity of her entire claim by a preponderance of the evidence.  Therefore, Debtors' Objection to Proof of Claim No. 15 is sustained, and Proof of Claim No. 15 filed by Lynn shall be allowed as a priority claim in the amount of $12,020.00.

        With regard to the unsecured portion of Kelsey's Proof of Claim No. 14, the Court finds that Peter had no legal obligation to payoff the remaining $1,000.00 owed on the Jeep Cherokee. However, Peter is obligated to repay Kelsey the $1,000.00 he borrowed from Kelsey's inheritance from her "Grandma Marge" and the $1,000.00 that Kelsey loaned Peter to cover his 2004 income tax obligations.  According to Kelsey's calculations, Peter has repaid $500.00 of the $2,000 that he borrowed.  Therefore, Kelsey is entitled to an unsecured obligation in the amount of $1,500 rather than $2,500.

        Finally, both Erin and Kelsey asseverate that they are entitled to a priority claim for the amounts they have spent on college.  Subparagraph (c) of paragraph 11 of the Decree of Dissolution specifically identifies the cost of post-secondary education, for up to 4 years for both Erin and Kelsey, as child support.  The Court would agree that the Decree of Dissolution allows

---

        [5]  Lynn did not disagree with the numbers asserted by Peter in Exhibit U and, therefore, the Court concludes that Peter did in fact make an extra maintenance payment of $5,040.00 sometime between May of 2000 and April of 2001.

Peter a great deal of flexibility in paying Erin and Kelsey's post-secondary education costs as allowed under paragraph 11(c), but such flexibility is trumped by this bankruptcy proceeding, particularly given the amendments to the United States Bankruptcy Code, 11 U.S.C. §§ 101-1330 by the Bankruptcy Abuse and Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. 109-8, 119 Stat. 23 (2005).

In the context of a Chapter 13 bankruptcy proceeding, 11 U.S.C. § 1322 instructs that a plan "shall . . . provide for the full payment, in deferred cash payments, of all claims entitled to priority under section 507 of this title[.]. Section 507(a)(1) accords first priority status to "[a]llowed unsecured claims for domestic support obligations . . . owed to or recoverable by a . . . child of the debtor". The term "domestic support obligation" is defined broadly at § 101(14A):

> [A] debt that accrues before, on, or after the date of the order for relief in a case under this title, including interest that accrues on that debt as provided under applicable nonbankruptcy law notwithstanding any other provision of this title, that is--
>
> (A) owed to or recoverable by--
>
>> (i) a spouse, former spouse, or child of the debtor or such child's parent, legal guardian, or responsible relative; or
>> (ii) a governmental unit;
>
> (B) in the nature of alimony, maintenance, or support (including assistance provided by a governmental unit) of such spouse, former spouse, or child of the debtor or such child's parent, without regard to whether such debt is expressly so designated;
>
> (C) established or subject to establishment before, on, or after the date of the order for relief in a case under this title, by reason of applicable provisions of--
>
>> (i) a separation agreement, divorce decree, or property settlement agreement;
>> (ii) an order of a court of record; or
>> (iii) a determination made in accordance with applicable nonbankruptcy

        law by a governmental unit; and

(D) not assigned to a nongovernmental entity, unless that obligation is assigned
voluntarily by the spouse, former spouse, child of the debtor, or such child's
parent, legal guardian, or responsible relative for the purpose of collecting the
debt.

The term "domestic support obligation" is broad and includes a wide variety of obligations and certainly encompasses the subclass of child support more particularly identified in Peter and Lynn's Decree of Dissolution as Erin's and Kelsey's tuition for post-secondary education, including room and board, for up to 4 years each. Therefore, the obligations set forth in Erin's Proof of Claim and the priority portion of Kelsey's Proof of Claim are included in the class of claims entitled to payment in full under § 1322. Moreover, while Peter enjoyed the luxury of making his "best efforts" to pay for Erin and Kelsey's costs of post-secondary education under the Decree of Dissolution, Peter, under the Bankruptcy Code, must repay such child support obligations as a first-tier priority expense over the life of his Chapter 13 Plan.

      With respect to the specific amount requested by Erin, the Court has reviewed the inquiry report from Carroll College, where Erin received her post-secondary education, and finds that Erin's tuition, room and board for the first year totaled roughly $18,084.00, which amount was offset by $11,126.00 in scholarships and grants, leaving Erin to pay $6,958.00 for the first year of her post secondary education. In year two, Erin's tuition, room and board totaled roughly $18,694.00, which amount was offset by scholarships and grants of approximately $11,436.00, leaving Erin to pay $7,258.00. In years 3 and 4, Erin did not live on campus. For purposes of this Memorandum, the Court will grant Erin a room and board credit in years 3 and 4 equal to her room and board charge in year 2, which was $4,936.00. Using the figure of $4,936.00, the Court

calculates that Erin should have spent about $19,667.00 on tuition, room and board in year 3, which amount was offset by $11,164.00 in scholarships and grants, leaving $8,503.00 for Erin to pay.  Finally, in year 4, Erin's tuition, room and board approximated $20,716.00, which amount was offset by scholarships and grants of $12,768.00, leaving Erin to pay $7,948.00.

Based upon the foregoing numbers, Erin had to pay $30,667.00 above and beyond her scholarships and grants of $46,494.00 to obtain her college degree in a period of 4 years.  Peter's Exhibits N and O reflect that Peter contributed a total of $3,898.00 toward Erin's education. Subtracting $3,898.00 from $30,667.00 reveals that Peter still owes Erin an additional $26,769.00 under paragraph 11(c) of the Decree of Dissolution.  However, at the hearing, Erin testified that she is not seeking reimbursement from Peter for her room and board during her junior and senior years of college.  Accordingly, the amount that Peter owes Erin is further reduced to $16,897.00 [$26,769 - ($4,936 x 2)].

Peter challenged at the hearing that he would owe Erin nothing for her college education had she attended a public school.  Peter's position was based on a review of the tuition and room/board charges that were charged at Montana State University during the years Erin was in college.  *See* Exhibit M.  According to Exhibit M, Erin's tuition and room/board charges between the Fall of 2001 through the Spring of 2005 would have totaled $37,164.00 at Montana State University, a public school.  Such amount, according to Peter, would have been more than offset by Erin's scholarships and grants, which the Court calculates as $46,494.00 and which Peter calculates as $48,339.00, leaving Peter to pay nothing.

Erin testified that she chose to attend a private college, rather than a public college, because of all the grants and scholarships that were available to her through the private college.

12

As noted earlier, the initial burden is on Peter to overcome the *prima facie* validity afforded by Rule 3001(f).  Peter offered not a single shred of evidence regarding scholarships that may have been available to Erin had she attended a public college.  Thus, the only evidence before the Court is Erin's credible testimony that the majority of the scholarships she received were available only if she attended Carroll College.

At any rate, had Erin attended a public school, rather than a private school, Peter would undoubtedly agree that Erin's tuition and room/board would have been $37,164.00.  Assuming that Erin would have at least received her Pell Grants, the state tuition, room and board would have been reduced by $6,250.00, leaving Erin with a potential claim to $30,914.00.  From the aforementioned amount, the Court would then deduct the amount contributed by Peter to Erin's education of $3,898.00, leaving Erin with a bill of $27,016.00 to attend a public school.  The sum of $27,016.00 is greater than the amount $16,897.00 that the Court has already determined that Peter owes Erin under the Decree of Dissolution.  Consequently, the Court finds no merit in Peter's argument that it would have cost him less if Erin had attended a public school.

Finally, Peter argues that Erin's claim must be reduced by monies that Peter paid for Erin to take a trip to Italy in 2002, the monies he spent helping Erin buy a car, and the monies he spent on car insurance for Erin, which amounts according to Peter to the total sum of $9,175.00.  Erin testified that she believed the car was a gift from her father.  The evidence, including Peter's testimony, comports with Erin's belief that the car was a gift.  Peter and Erin agreed at the hearing that Peter was not financially able to make the final three car payments on Erin's car.  Consequently, Erin made the final three payments to protect her credit.  The fact that Peter was making the payments on Erin's car strongly suggests that the car was intended to be a gift.  Peter

13

cannot now claim that he wants the money back.

Similarly, Peter submitted Exhibit P, copies of Montana Personal Auto Applications dated June 25, 2007, and June 26, 2007, which purport to show that Peter spent $3,454.00 for auto insurance on a Plymouth Neon during the period of time from May 15, 2001, to May 15, 2005. Peter claims that any amounts he owes Erin should be offset by the amount he paid toward Erin's car insurance. Erin testified that she and her dad did discuss at one time that Peter wanted assistance with making the insurance payments. As a result of their discussion, Peter and Erin agreed that Peter would call Erin and ask for payments when needed. Peter called Erin on three occasions, and on each occasion, Erin sent Peter payments of $66.00 each, for a total of $198.00. Based upon the foregoing, the Court concludes that Erin paid Peter what he requested for car insurance and she owes Peter nothing further for car insurance at this late date.

Peter and Erin also agree that Peter paid for Erin's trip to Italy during her freshman year of college. No evidence in the record suggests that Peter's financial assistance was anything more than a gift to his daughter. In light of the forgoing, the Court sets the allowed amount of Erin's priority claim at $16,897.00.

The Court performed a similar analysis as discussed above on Kelsey's Proof of Claim. However, Kelsey testified that her tuition is being paid for by a full-ride scholarship. The foregoing is reflected in the attachments to Kelsey's Proof of Claim. For example, during the Spring semester of 2007, a student transaction summary report from Montana State University lists various fees assessed against Kelsey. The fees are reduced by a Pell Grant, an Honors Fee Waiver and a tuition rebate. In addition, the fees appear to be increased by a refund and decreased by a Stafford Subsidized Loan. The purpose of the refund was not explained by

14

Kelsey, and the Stafford Subsidized Loan is most undoubtedly a loan for which Kelsey is liable. Thus, considering all the fees, as reduced by grants, fee waivers and rebates, but disregarding the refund and Stafford Loan, it appears that Kelsey's school obligation during the Spring semester of 2007 was only $257.30. Such finding comports with Kelsey's testimony that she has a full ride scholarship for tuition.

Thus, the only amount that Peter needs to pay on behalf of Kelsey for her college education is room and board. Kelsey lived on campus her freshman year and the attachments to Kelsey's Proof of Claim show that Kelsey paid $5,746.00 during the 2004/2005 school year for "N Hedges-double-7 day PLUS". Kelsey testified that she was a resident advisor during her sophomore year of college and as partial compensation for serving in such capacity, Kelsey received free room and board. During her junior year, Kelsey lived in an apartment for approximately 5 months, and then moved in with her boyfriend, who paid Kelsey's living expenses. The typical school year is 9 months long. Based upon Kelsey's testimony, she should be entitled to 5/9 of the dormitory style room and board charges for the 2006/2007 school season. Using the room and board estimate from Peter's Exhibit M, the Court concludes that Peter should have to reimburse Kelsey roughly $3,583.00 for room and board stemming from the 2006/2007 school year. Considering Kelsey's room and board for her freshman and junior years, Peter is obligated to pay Kelsey $9,329.00 under the Decree of Dissolution.

As with Erin, Peter is attempting to reduce the amounts he owes Kelsey under the Decree of Dissolution by amounts he paid on behalf of Kelsey over the past several years. The amount Peter claims for car insurance paid on behalf of Kelsey fails for the same reason as discussed above with respect to his claim against Erin. Similarly, the Court finds that Peter intended to

purchase the Jeep Cherokee for Kelsey as a gratuitous gesture and only after his financial situation deteriorated did Peter attempt to cast his gift in a different light, to the detriment of his daughter. The Court is not persuaded that Kelsey' claim is subject to any reduction, other than as discussed herein. Therefore, Kelsey's claim shall be allowed as a priority claim in the amount of $9,329.00 and shall be allowed as a general unsecured claim in the amount of $1,500.00.

The priority amounts listed in Erin's and Kelsey's Proofs of Claim are both derived from Erin's and Kelsey's student loan obligations. The amounts that Erin and Kelsey owe for student loans is not an accurate indicator of what Erin and Kelsey have spent on tuition, room and board. The student loan debt most certainly covers books and other incidentals, which items are not included in the Decree of Dissolution. The Court finds that the amounts that the Court has determined are owed by Peter to Lynn, Erin and Kelsey, as discussed in this Memorandum, are consistent with the intent of provisions contained in the Decree of Dissolution. Accordingly, the Court will enter a separate order providing as follows:

IT IS ORDERED:

1. Debtors' Objection to Proof of Claim No. 15 filed by Lynn Van Nice is SUSTAINED in part; and Proof of Claim No. 15 filed by Lynn Van Nice shall be allowed as a priority claim in the amount of $12,020.00

2. Debtors' Objection to Proof of Claim No. 30 filed by Erin Lee Lanigan is SUSTAINED in part; and Proof of Claim No. 30 filed by Erin Lee Lanigan shall be allowed as a priority claim in the amount of $16,897.00.

3. Debtors' Objection to Amended Proof of Claim No. 14 filed by Kelsey Van Nice is SUSTAINED in part; and Proof of Claim No. 14 filed by Kelsey Van Nice shall be allowed as a

16

priority claim in the amount of $9,329.00 and as a general unsecured claim in the amount of $1,500.00.

    4.  A further hearing on confirmation of Debtors' Fourth Amended Chapter 13 Plan filed July 3, 2007, shall be held **Tuesday, August 14, 2007, at 09:00 a.m.**, or as soon thereafter as the parties can be heard, in the 2ND FLOOR COURTROOM, FEDERAL BUILDING, 400 N. MAIN, BUTTE, MONTANA.

                    BY THE COURT

                    HON. RALPH B. KIRSCHER
                    U.S. Bankruptcy Judge
                    United States Bankruptcy Court
                    District of Montana

17